1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

11

12

13

14

15

| | |
|---|---|
| D.C., a minor,<br><br>        Plaintiff,<br><br>   v.<br><br>SEARS, ROEBUCK AND CO.;<br>HUSQVARNA OUTDOOR PRODUCTS,<br>INC., ELECTROLUX HOME PRODUCTS,<br>INC.,<br><br>        Defendants. | CASE NO. C06-5391RJB<br><br>ORDER GRANTING IN PART<br>AND DENYING IN PART<br>DEFENDANTS SEARS,<br>ROEBUCK AND CO. AND<br>HUSQVARNA OUTDOOR<br>PRODUCTS, INC.'S MOTION<br>FOR SUMMARY JUDGMENT |

16

17

18

19

20

     This matter comes before the Court upon the Defendants Sears, Roebuck and Co. And Husqvarna Outdoor Products, Inc.'s Motion for Summary Judgment (Dkt. 53). The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file herein. The Court finds the issues presented in the Motion for Summary Judgment suitable for decision without oral argument.

21

## I. FACTUAL AND PROCEDURAL BACKGROUND

22

23

24

25

26

27

28

     The following facts are undisputed or taken in the light most favorable to the plaintiff: The minor plaintiff, D.C., was injured on April 10, 2004, by a lawn tractor operated in reverse by his grandfather. The lawn tractor at issue is a Craftsman-brand lawn tractor, model number 917.272481 manufactured by Electrolux Home Products, Inc. ("Electrolux) on May 29, 2002, and sold by Sears Roebuck and Co. ("Sears") to Virgil Cawyer, D.C.'s grandfather on June 16, 2002. The plaintiff alleges that the lawn tractor was defectively designed and marketed because it

1  did not include a No Mow in Reverse ("NMIR") child backover safety feature to prevent the

2  tractor from operating in reverse while the blades rotate. Dkt. 64 at 2.

3       The second amended complaint alleges the following: (1) violation of the Washington

4  Product Liability Act, (2) negligence, (3) strict liability, (4) breach of express and implied

5  warranties, (5) and violation of the Consumer Protection Act. Dkt. 46 at 3-4.

6                        **II. SUMMARY JUDGMENT STANDARD**

7       Summary judgment is proper only if the pleadings, depositions, answers to interrogatories,

8  and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

9  to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

10 P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party

11 fails to make a sufficient showing on an essential element of a claim in the case on which the

12 nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

13 There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a

14 rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*

15 *Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative

16 evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a

17 genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed

18 factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v.*

19 *Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

20 *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

21       The determination of the existence of a material fact is often a close question. The court

22 must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

23 e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec.*

24 *Serv., Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of

25 the nonmoving party only when the facts specifically attested by that party contradict facts

26 specifically attested by the moving party. The nonmoving party may not merely state that it will

27 discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

28 to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

1  Conclusory, non specific statements in affidavits are not sufficient, and missing facts will not be

2  presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

3  ## III. WASHINGTON PRODUCT LIABILITY ACT

4      The Washington Product Liability Act ("WPLA") is one component of a broad legislative

5  effort at reforming the law of torts. *Washington Water Power Co. v. Graybar Elec. Co.*, 112

6  Wn.2d 847 (1989), *amended by* 779 P.2d 697. The WPLA encompasses product liability claims,

7  which are defined to include the following:

8      any claim or action previously based on: Strict liability in tort; negligence; breach of
   express or implied warranty; breach of, or failure to, discharge a duty to warn or instruct,

9  whether negligent or innocent; misrepresentation, concealment, or nondisclosure, whether
   negligent or innocent; or other claim or action previously based on any other substantive

10 legal theory except fraud, intentionally caused harm or a claim or action under the
   consumer protection act, chapter 19.86 RCW.

11

12 RCW 7.72.010(4). The WPLA displaces common law claims for product liability. *Graybar Elec.*

   *Co.*, 112 Wn.2d at 853. Claims under the WPLA do not require contractual privity. RCW

13 7.72.010(5); *Graybar Elec. Co.*, 112 Wn.2d at 851. The WPLA differentiates between the liability

14 of manufacturers and product sellers other than manufacturers. *See* RCW 7.72.030-040.

15 **A. LIABILITY OF MANUFACTURERS**

16     Manufacturers are liable for products that are not reasonably safe due to the design or to

17 inadequate warnings. RCW 7.72.030(1) ("A product manufacturer is subject to liability to a

18 claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in

19 that the product was not reasonably safe as designed or not reasonably safe because adequate

20 warnings or instructions were not provided.").

21     To meet the requirements of proximate causation, plaintiffs must put forth evidence of

22 both cause in fact and legal causation. *Baughn v. Honda Motor Co., Ltd.*, 107 Wn.2d 127, 142

23 (1986). Cause in fact concerns the 'but for' consequences of an act or the physical connection

24 between the act and the injury. *Id.* Cause in fact is a question of fact that generally reserved for

25 the jury, but cause in fact may be determined as a matter of law if "the facts are undisputed and

26 the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion." *Id.*

27 Legal causation, on the other hand, involves the "determination of whether liability *should* attach

28

ORDER
Page 3

1   as a matter of law given the existence of cause in fact." *Hartley v. State*, 103 Wn.2d 768, 779

2   (1985) (emphasis in original).

3        To determine whether a product's design was not reasonably safe, courts balance the

4   likelihood of harm and the burden of producing a safer product:

> A product is not reasonably safe as designed, if, at the time of manufacture, the likelihood
> that the product would cause the claimant's harm or similar harms, and the seriousness of
> those harms, outweighed the burden on the manufacturer to design a product that would
> have prevented those harms and the adverse effect that an alternative design that was
> practical and feasible would have on the usefulness of the product. . . .

RCW 7.72.030(1)(a).

       To determine whether a product's warnings were inadequate, courts consider the

likelihood of harm and the ability of the manufacturer to provide adequate warnings:

> A product is not reasonably safe because adequate warnings or instructions were not
> provided with the product, if, at the time of manufacture, the likelihood that the product
> would cause the claimant's harm or similar harms, and the seriousness of those harms,
> rendered the warnings or instructions of the manufacturer inadequate and the
> manufacturer could have provided the warnings or instructions which the claimant alleges
> would have been adequate.

RCW 7.72.030(1)(b). The Washington Supreme Court has held that these sections of the WPLA

define a strict liability standard for design defect cases, despite the use of the term "negligence" in

RCW 7.72.030(1). *Ayers By and Through Ayers v. Johnson & Johnson Baby Products Co.*, 117

Wn.2d 747, 761-765 (1991). There are two tests for determining whether a product is

unreasonably dangerous.

       Under the risk utility test, the plaintiff may attempt to establish liability by showing that, at

time of manufacture, the likelihood that the product would cause the plaintiff's harm and the

seriousness of those harms outweighed the manufacturer's burden to design a product that would

not have caused the harms and any adverse effect that a practical, feasible alternative would have

on the product's usefulness. *Soproni v. Polygon Apartment Partners*, 137 Wn.2d 319, 326

(1999).

       Under the consumer expectations test, the plaintiff may seek to show that the product was

unsafe to an extent beyond that which would be contemplated by ordinary consumers. *Id.* at 327;

ORDER
Page 4

RCW 7.72.030(3). Consumer expectations are judged against the reasonable expectations of ordinary consumers. *Soproni*, 137 Wn.2d at 327. The Washington Supreme Court has noted that "it may be unreasonable for a consumer to expect product design to depart from legislative or administrative regulatory standards, even if to do so would result in a safer product." *Falk v. Keene Corp.*, 113 Wn.2d 645, 655 (1989). It is for the trier of fact to determine if the product was unsafe to an extent beyond that which would be expected by an ordinary consumer. RCW 7.72.030(3).

**B. LIABILITY OF PRODUCT SELLERS**

If one or more of the following circumstances are present, a product seller is liable for product defects to the same extent as a manufacturer:

(a) No solvent manufacturer who would be liable to the claimant is subject to service of process under the laws of the claimant's domicile or the state of Washington; or

(b) The court determines that it is highly probable that the claimant would be unable to enforce a judgment against any manufacturer; or

(c) The product seller is a controlled subsidiary of a manufacturer, or the manufacturer is a controlled subsidiary of the product seller; or

(d) The product seller provided the plans or specifications for the manufacture or preparation of the product and such plans or specifications were a proximate cause of the defect in the product; or

(e) The product was marketed under a trade name or brand name of the product seller. RCW 7.72.040(2). Otherwise, a product seller is liable to only if the plaintiff's harm was proximately caused by the (1) the negligence of the product seller, (2) the breach of an express warranty made by the product seller, or (3) the intentional misrepresentation of facts or intentional concealment of information by the product seller. RCW 7.72.040(1).

## III. DISCUSSION

The plaintiff contends that Sears and Husqvarna are both manufacturers and product sellers and are liable for defective design, that the warnings and instructions accompanying the lawn tractor were inadequate, and that exemplary damages, punitive damages, or both may be

1    recoverable. Dkt. 64 at 17-22.

2    **A. DEFECTIVE DESIGN**

3         The plaintiff seeks to establish that the lawn tractor was defectively designed under both

4    the risk-utility and the consumer expectations test. Dkt. 64 at 17, 20.

5         **1. Risk Utility Test**

6         To withstand summary judgment under the risk utility test, the plaintiff must create a

7    genuine issue of material fact as to whether, at time of lawn tractor's manufacture, the likelihood

8    that the product would cause the plaintiff's harm and the seriousness of those harms outweighed

9    the manufacturer's burden to design a product that would not have caused the harms and any

10   adverse effect that a practical, feasible alternative would have on the product's usefulness.

11   *Soproni*, 137 Wn.2d at 326. The plaintiff contends that several no mow in reverse features could

12   have been utilized on the lawn tractor to prevent the plaintiff's harm. Dkt. 64 at 17. According to

13   one of the plaintiff's proffered experts, Kevin B. Sevart, "[a]t the time the subject lawn tractor

14   was manufactured, lawn tractors manufactured by MTD/Cub cadet, John Deere, Kubota,

15   Snapper, and Toro all had some form of NMIR. Currently all makes of consumer model lawn

16   tractors, including Sears Craftsman, incorporate some form of NMIR." Dkt. 58, Exh. L at 80. Mr.

17   Sevart lists several design alternatives:

18        a. A NMIR feature to disengage and stop rotation of the blades, while the engine
          continued to run, when the shift lever is moved into reverse.

19

20        b. A NMIR feature to stop the engine when the shift lever is moved into reverse with the
          blades engaged.

21        c. A NMIR feature that would prevent the lawn tractor from being shifted into reverse
          while the blades were engaged, and would prevent the blades from being engaged while

22           the mower was in reverse.

23   *Id.* at 82. The defendants' proffered expert, Cliff Boylston, disagrees, contending that NMIR

24   features were "unacceptable to a significant number of users" at the time when the lawn tractor in

25   this case was manufactured. Dkt. 58, Exh. E at 50. In addition, the defendants's expert contests

26   the efficacy of NMIR devices because they allow tractors to move in reverse  while the blades

27   wind down. *Id.*

28

1    Mr. Sevart's opinion is consistent with that of Dr. Jeffrey Ketchman, another expert on

2  behalf of the plaintiff:

3         A NMIR device that would have shut off the engine when the transmission was shifted
          into reverse with the blades engaged would have stopped the rearward motion for the
4         mower before blade contact. A NMIR that would have preventing shifting into reverse
          unless the blades were disengaged would also have prevented the devastating blade
5         injuries.

6   Dkt. 58, Exh. M at 87-88. In his report, Dr. Ketchman acknowledges that mowers with NMIR

7  devices may "be modified to include an operator override feature for special/rare situations/araes

8  where mowing in FORWARD is impossible." *Id.* at 89. The defendants contest Dr. Ketchman's

9  terminology, contending that a no mow in reverse device cannot possibly include an override

10 feature allowing the operator to mow in reverse. Dkt. 53 at 16.

11    The defendants contend that summary judgment is proper because the proposed design

12 alternatives would not prevent the injury that occurred in this case. *Id.* at 18. In support, the

13 defendants cite evidence demonstrating that tractors with NMIR devices and with operator

14 override features have caused backover injuries. *Id*; Dkt. 58, Exh. E. at 51 (According to Mr.

15 Boylston's expert report, "[t]here have been at least four backover incidents with MTD NMIR

16 lawn tractors."); *see also* Dkt. 58, Exh. P at 106 (Defendants' proffered expert Gerald A. Coons

17 opining that [t]he MTD NMIR system proposed by Mr. Sevart does not eliminate the potential

18 for blade contact injuries with bystanders, including during operation in reverse."). To withstand

19 summary judgment, the plaintiffs need only create a genuine issue of material fact as to whether

20 design alternatives would have increased the safety or decreased the risk of injury posed by the

21 tractor without sacrificing the tractor's essential function. *See Ruiz-Guzman v. Amvac Chemical*

22 *Corp.*, 141 Wn.2d 493, 503-04 (2000) ("If another product can more safely serve the same

23 purpose as the challenged product at a comparable cost and in a similar manner, a jury should be

24 able to conclude that the risks of the challenged product outweigh its utility."); *Lamon v.*

25 *McDonnell Douglas Corp.*, 91 Wash.2d 345, 352 (1979) (affirming reversal of dismissal on

26 summary judgment where the plaintiff "raise[d] the inference that a reasonable alternative which

27 poses less risk [wa]s feasible."). From the evidence presented thus far, there is a reasonable

28

1   inference that one or more design alternatives available at the time the lawn tractor was

2   manufactured could have "more safely served" the lawn tractor's purposes and posed less risk of

3   backover injury.

4          The defendants contend that even if safer design alternatives could reduce the risk of

5   backover injuries, such alternatives would eliminate the tractor's essential function. Dkt. 53 at 17.

6   The defendants' cited authority on this point is distinguishable from this case.

7          The defendants cite a Pennsylvania case for the proposition that the social utility of

8   operating a lawn tractor in reverse outweighs the risk of harm. In *Berrier v. Simplicity Corp.*, 413

9   F. Supp. 2d 431, 434 (E.D.Pa. 2005), the court granted a motion for summary judgment on the

10  plaintiffs' claim that a riding lawn mower manufactured by the defendant was negligently

11  designed. One of the questions before the court was whether the defendant owed a duty to the

12  plaintiffs, and Pennsylvania law required the court to analyze the following: (i) relationship

13  between the parties; (ii) social utility of the defendants' conduct; (iii) nature of the risk imposed

14  and foreseeability of the harm incurred; (iv) consequences of imposing a duty upon the defendant;

15  and (v) the overall public interest in the proposed solution. *Berrier*, 413 F. Supp. at 443. Based

16  upon the record before it, the court concluded that the social utility of operating a riding lawn

17  mower in reverse outweighed the risk of harm. *Id.* This conclusion reflects not only the court's

18  finding that the ability to mow in reverse has social utility but also the court's conclusion that the

19  plaintiffs failed to create a genuine issue of material fact as to whether a NMIR device would

20  increase the mower's safety. *Id.* at 444. In this case, the plaintiff has created a genuine issue of

21  material fact as to whether design alternatives incorporating a NMIR device would increase the

22  tractor's safety.

23         The defendants also contend that the design alternatives proposed by the plaintiff would

24  eliminate the lawn tractor's essential function, analogizing this case to *Thongchoom v. Graco*

25  *Children's Products, Inc.*, 117 Wn.App. 299, 304 (2004). In *Thongchoom*, the court affirmed

26  summary judgment for the defendant, in part because the proposed alternative undermined the

27  product's essential function. *Thongchoom*, 117 Wn.App. at 304 ("The walker was designed to

28  give a baby mobility, the very feature that makes the product dangerous. The only alternative

ORDER
Page 8

1  design would . . . not allow a baby to move. Such a design, however, completely changes the

2  product."). The defendants do not demonstrate that alternative designs would require removal of

3  the cutting blade, rendering the tractor useless for cutting grass.

4      **2. Consumer Expectations Test**

5      To withstand summary judgment under the consumer expectations test, the plaintiff must

6  create a genuine issue of material fact as to whether the product was unsafe to an extent beyond

7  that which would be contemplated by ordinary consumers. *Soproni*, 137 Wn.2d at 327; RCW

8  7.72.030(3). Consumer expectations are judged against the reasonable expectations of ordinary

9  consumers. *Id.* at 327. This question is ordinarily reserved for the trier of fact. RCW 7.72.030(3).

10      The defendants contend that ordinary consumers understand the danger of personal injury

11  posed by rotation of sharp, steel blades and that the danger is obvious whether the tractor is

12  moving forwards or backwards. Dkt. 53 at 15. The plaintiff contends that the danger of backing

13  over a child is not obvious to ordinary consumers because the design of the tractor creates a blind

14  spot. There is evidence in the record to support this assertion. Dkt. 65-4, Exh. C at 5 (Dr.

15  Ketchman contends that the design of the mower creates a blind spot for the driver.). The Court

16  should therefore decline to grant summary judgment as to whether the plaintiffs can satisfy the

17  consumer expectations test.

18      **3. Conclusion**

19      The plaintiff has presented evidence from which a the trier of fact may conclude that the

20  lawn tractor that injured D.C. was defective under either the risk utility test or the consumer

21  expectations test. There is a genuine issue of material fact as to whether design alternatives

22  incorporating a NMIR device would increase the tractor's safety without undermining the

23  tractor's essential purpose. There is also evidence that the design of the tractor creates a blind

24  spot, evidence from which the trier of fact could conclude that ordinary consumers do not

25  contemplate the danger of backover accidents. Summary judgment as to the defectiveness of the

26  lawn tractor should therefore be denied.

27

28  **B. INADEQUATE WARNINGS**

ORDER
Page 9

1    The plaintiff seeks to establish that the warnings and instructions accompanying the lawn

2 tractor were inadequate under both the risk-utility and the consumer expectations test. Dkt. 64 at

3 17, 20; *see Thongchoom*, 117 Wn.App. at 305-06 ("As with a claim of defective design, a plaintiff

4 may establish liability through either this risk-utility test or the consumer expectations test.").

5    The lawn tractor that injured D.C. has the following warnings, among others, displayed on

6 the tractor itself:

7    IF MACHINE STOPS GOING UPHILL, STOP BLADES AND BACK DOWN

8    SLOWLY.

9    DO NOT MOW WHEN CHILDREN AND OTHERS ARE IN THE MOWING AREA.

10   LOOK DOWN AND BEHIND BEFORE AND WHILE BACKING.

11 Dkt. 54-2, Exh. B3 at 9. The Owner's manual accompanying the tractor includes the following

12 warnings:

13
14   Be sure the area is clear of other people before mowing. Stop machine if anyone enters the
     area.

15   . . .

16   Do not mow in reverse unless absolutely necessary. Always look down and behind before
17   and while backing.

18   . . .
     Turn off blades when not mowing.
19
     . . .
20
21   Before and while backing, look behind and *down* for small children.

22   . . .
23   Use extra care when approaching blind corners, shrubs, trees, or other objects that
     obscure vision.

24 Dkt. 59, Exh. D at 6 (emphasis in original). The defendants ask the Court to rule as a matter of

25 law that these warnings were adequate.

26    First, the defendants contend that there is no duty to warn when the person for which the

27 warning is intended knows of the danger. Virgil Cawyer, who was operating the tractor when the

28 accident occurred, told Foremost Insurance Group that he "should have disengaged the blades"

ORDER
Page 10

1   and "looked back" to prevent the injury to D.C. Dkt. 54-2, Exh. A at 5; *but see* Dkt. 65-14, Exh.

2   K at 13 (Mr. Cawyer testifying that he "kind of glanced backwards."). It is unclear whether Mr.

3   Cawyer knew, before the accident occurred and without the benefit of hindsight, that he should

4   have disengaged the tractor's blades before operating the tractor in reverse and whether he knew

5   that there was a blind spot.

6         Second, the defendants urge the Court to follow the reasoning of a case from the District

7   of Utah, Central Division, in which the court held that "[t]he warnings couldn't be clearer." *See*

8   Dkt. 53 at19-20; Dkt. 58, Exh. Q at 120 (case excerpt). The case is of limited assistance to this

9   Court, in part because it is unclear from the excerpt provided whether the lack of a warning

10  regarding a blind spot was before the court.

11        Finally, the defendants appear to contend that the allegedly deficient warnings were not a

12  proximate cause of D.C.'s injuries. Dkt. 53 at 20. The defendants' contention on this point is

13  brief: "Therefore, whether evaluating the product warnings under the consumer expectations test

14  or risk utility analysis, the warnings provided by defendants are adequate as a matter of law, and if

15  followed, would have prevented minor-plaintiff's injuries." *Id.* It is not clear, as a matter of law,

16  whether Mr. Cawyer followed all of the safety instructions and warnings or whether his failure to

17  do so was the proximate cause of D.C.'s injuries. A reasonable juror could conclude that the

18  failure to warn tractor operators to turn off the blades when operating the tractor in reverse or to

19  alert operators to the possibility that the tractor itself may obscure the operator's vision when

20  operating the tractor in reverse satisfies the risk utility test, the consumer expectations test, or

21  both.

22  **C. EXEMPLARY AND PUNITIVE DAMAGES**

23        In the event that summary judgment is denied, the defendants seek a ruling barring the

24  plaintiff from recovering punitive damages. Dkt. 53 at 23.

25        Federal district courts must apply the choice of law rules of the state where the federal

26  court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Washington courts

27  apply the choice of law analysis set out in the Restatement (Second) of Conflict of Laws. *Fluke*

28  *Corp. v. Hartford Accident & Indem. Co.*, 145 Wn.2d 137 (2001). The threshold inquiry is

1  whether there is a conflict of laws. *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93 (1994).

2  Washington courts then examine which state has the most significant contacts in light of the

3  principles stated in Restatement of Conflicts §145. *Johnson v. Spider Staging Corp.*, 87 Wn.2d

4  577, 581-81 (1976). Finally, courts examine which state has the most significant interest in

5  applying its law on a particular issue in light of the principles stated in Restatement of Conflicts

6  §6. *Id.* at 582. Each issue is examined separately. *Williams v. State*, 76 Wn. App. 237, 243

7  (1994). There is presumption that the law of the place of the injury applies in personal injury

8  cases. *Zenaida-Garcia v. Recovery Systems Technology, Inc.*, 128 Wn. App. 256,261-62 (2005).

9  The presumption is overcome if another state has a greater interest in determination of a particular

10  issue. *Id.* at 262.

11      First, the Court notes that Washington and Illinois law are in conflict with respect to the

12  award of punitive damages. In Washington, "punitive damages are not allowed unless expressly

13  authorized by the legislature." *Barr v. Interbay Citizens Bank of Tampa, Florida*, 96 Wn.2d 692,

14  635 (1981), *amended by* 96 Wn.2d 692 (1982). Punitive damages may be recoverable under

15  Illinois law. *See Townsend ex rel. Townsend v. Sears, Roebuck and Co.*, 858 N.E.2d 552, 557 (Ill.

16  App. Ct. 2006). The plaintiffs contend that Illinois law applies in this case because Illinois has the

17  most significant contacts.

18      Second, the Court examines which state has the most significant contacts, following the

19  principles of Restatement of Conflicts §145, which provides as follows:

20      1) The rights and liabilities of the parties with respect to an issue in tort are determined by
        the local law of the state which, with respect to that issue, has the most significant
21      relationship to the occurrence and the parties under the principles stated in § 6.

22      (2) Contacts to be taken into account in applying the principles of § 6 to determine the law
        applicable to an issue include:
23

24      (a) the place where the injury occurred,

25      (b) the place where the conduct causing the injury occurred,

26      (c) the domicil, residence, nationality, place of incorporation and place of business
        of the parties, and

27      (d) the place where the relationship, if any, between the parties is centered.

28      These contacts are to be evaluated according to their relative importance with respect to

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the particular issue.

Rest. 2d Conflicts §145. In this case, Washington's contacts are as follows: Washington is the forum state, the plaintiff is a resident of Washington, the product was purchased in Washington, and the injury occurred in Washington. Illinois's contacts are as follows: Sears's principal place of business is in Illinois. Considering the not only the number, but also the nature, of contacts, the Court concludes that Washington has the most significant contacts with the parties and the events underlying this case.

     Finally, the Court notes that while Illinois may have an interest in punishing the wrongful conduct of businesses who establish a principal place of business in Illinois, such an interest does not outweigh the "expressed policy" disfavoring punitive damages in Washington, the forum state. *Fluke Corp. v. Hartford Accident & Indem. Co.*, 102 Wn. App. 237, 248 (2000), *aff'd*, 145 Wn.2d 137 (2001) ("But Washington does not have a policy of imposing punitive damages to punish and deter wrongdoing. Washington's only expressed policy regarding punitive damages is that they are not favored."); *but see Townsend*, 858 N.E.2d 552 at 561. The Court should therefore grant the motion as to the plaintiff's claim to punitive damages.

**D. OTHER CLAIMS**

     In the response, the plaintiff withdraws allegations of breach of express and implied warranty and claims under the Consumer Protection Act. Dkt. 64 at 3. Accordingly, those claims should be dismissed. The plaintiff did not expressly withdraw the negligence claim, but dismissal on this claim is also warranted because such a claim is displaced by the WPLA. *Graybar Elec. Co.*, 112 Wn.2d at 853. Accordingly, the plaintiff's only remaining claim is under the WPLA, and the plaintiff is not entitled to recovery of punitive damages for such a claim.

**IV. ORDER**

     Therefore, it is hereby

     **ORDERED** that Defendants Sears, Roebuck and Co. And Husqvarna Outdoor Products, Inc.'s Motion for Summary Judgment (Dkt. 53) is **GRANTED in part** and **DENIED in part** as provided herein.

1    The Clerk of the Court is instructed to send uncertified copies of this Order to all counsel

2    of record and to any party appearing pro se at said party's last known address.

3        DATED this 24th day of July, 2007.

4

5

6

7    ROBERT J. BRYAN
     United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER
Page 14